UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Interstate Removal, LLC,<br><br>        Plaintiff,<br><br>vs.<br><br>National Specialty Insurance Company,<br><br>        Defendant. | Case No.<br><br>COMPLAINT |

COMPLAINT – JURY TRIAL REQUESTED
(DECLARATORY JUDGMENT AND BREACH OF CONTRACT)

COMES NOW Plaintiff, Interstate Removal, LLC ("Plaintiff"), by its counsel, MILER & STEVENS, P.A., as and for a claim against Defendant, National Specialty Insurance Company, alleges and asserts to the best of its knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

PARTIES

1.    Plaintiff, Interstate Removal, LLC ("Interstate"), is a Minnesota limited liability company with its principal place of business in Forest Lake, Minnesota.

2.    Defendant, National Specialty Insurance Company ("National"), is an insurance company with its principal place of business at 1900 L. Don Dodson Drive, Suite 1109, Bedford, Texas, 76021. Upon information and belief, it was at all times

1

pertinent to this Complaint authorized to and conducting business in the State of Minnesota.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction in this matter under 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000 and the matter is between citizens of different states.

4. This Court has personal jurisdiction over Defendant because they transact business in this District and have significant contacts with this District.

5. Venue is appropriate in this District as Plaintiff transacts and conducts its business in Minnesota. The Policy provides coverage for Plaintiff and its Minnesota business. Venue is appropriate within the meaning of 28 U.S.C. §1391(b)(2) because a substantial part of the events that give rise to the claim occurred in this District.

## FACTS
## THE INSURANCE POLICY

6. At all relevant times, Plaintiff was insured by Defendant's Commercial Cyber Insurance Policy, Policy Number: BLU-CV-M5C5QQV3X-002, covering the term October 6, 2021 to October 6, 2022 (the "Policy"). A true and correct copy of the Policy is attached as **Exhibit A**.

7. The Policy insures losses due to **Cyber Incidents, Extortion Threat, Security Breach, Computer and Funds Transfer Fraud** (add-on endorsement), and **Social Engineering Fraud** (add-on endorsement).

8. The Policy's aggregate limit of insurance is $500,000 per occurrence with a $1,000 deductible.

9. The Policy's **Computer and Funds Transfer Fraud Endorsement** carries a per occurrence limit of $500,000 with a $1,000 deductible.

10. The **Computer and Funds Transfer Fraud** states in relevant parts:

> **Computer And Funds Transfer Fraud**
>
> 1. We will pay for:
>
>    a. **Loss** resulting directly from a fraudulent:
>
>       (1) Entry of **Electronic Data** or **Computer System** into; or
>       (2) Change of **Electronic Data** or **Computer System** within;
>
>       a **Computer System**, provided the fraudulent entry or fraudulent change causes, with regard to Paragraphs **1.a.(1)** and **1.a.(2)**:
>
>          (a) Money, securities or other property to be transferred, paid or delivered; or
>          (b) Your account at a financial institution to be debited or deleted.
>
>    b. **Loss** resulting directly from a **Fraudulent Instruction** directing a financial institution to debit your **Transfer Account** and transfer, pay or deliver money or securities from that account.

11. The Policy defines **Electronic Data** as:

> **Electronic Data** means information, facts, images or sounds stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software) on electronic storage devices including, but not limited to, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment. **Electronic Data** is not tangible property.
>
> **Electronic Data** does not include Your **Electronic Data** that is licensed, leased, rented or loaned to others.

12. The Policy defines **Computer System** as:

> **Computer System** means any computer, including transportable or handheld devices, electronic storage devices and related peripheral components; any systems and applications software, or any related telecommunications networks connected to or used in connection with such computer or devices: i) which collects, transmits, processes, stores or retrieves Your **Electronic Data**; and ii) which is:
>
> a. owned by You;
> b. leased by You and operation by any **Insured**;
> c. owned and operated by an **Employee** who has agreed in writing to Your personal devise use policy;
> d. operated by an authorized **Third Party**, but only with respect to Your **Electronic Data**.

13. The Policy's **Social Engineering Fraud Endorsement** carries a per occurrence limit of $100,000 with a $10,000 deductible.

14. The **Social Engineering Fraud Endorsement** states in relevant parts:

> **I.** The following Insuring Agreement is added to the end of **SECTION I – INSURING AGREEMENTS:**
>
> **7. Social Engineering**
>
> We will pay for **Social Engineering Loss** resulting directly from a **Social Engineering Incident**, provided such **Social Engineering Incident** is first **Discovered** during the Policy Period.
>
> **c. Social Engineering Incident** means the intentional misleading of an **Insured** to transfer **Money** to a person, place or account beyond the **Named Insured's** control resulting directly from the **Named Insured's** employee's good faith reliance upon an instruction transmitted via email, purporting to be from:
>
> i. a natural person or entity who exchanges, or is under contract to exchange, goods or services with the **Named Insured** for a fee (other than a financial institution, asset manager, broker-dealer, armored motor vehicle "named insured" or any similar entity); or
>
> ii. an employee of the **Named Insured**;
> but which contained a fraudulent and material misrepresentation and was sent by an imposter. As a condition precedent to coverage, the **Insured's** established and documented verification procedure must have been followed before acting upon such instruction.

15. Interstate has satisfied all of its obligations under the Policy, including, by not limited to, the timely payment of annual premium and the proper reporting of its losses under the Policy.

## THE LOSS

Interstate restates the above allegations as if fully set forth herein.

16. Interstate operates as a service provider for many commercial properties. Interstate conducts snow and ice removal, asphalt paving, concrete work, excavation work, and other services year-round.

17. In or about April or May of 2022, Interstate purchased vehicles from Ryder Vehicle Sales, LLC ("Ryder"), out of Minneapolis, Minnesota.

4

18. As is customary between Ryder and Interstate, Interstate received the new vehicles and was allowed a "test drive" period, and some time to use the vehicles prior to making payment for the vehicles.

19. On Friday, May 6th, 2022, an employee of Ryder, the Vehicle Sales Manager, Kathleen J. Mead ("Kathy"), emailed Jim Allen of Interstate about the vehicles and she requested payment for them:

> From: Kathleen J Mead <Kathleen_J_Mead@ryder.com>
> Sent: Friday, May 6, 2022 12:34 PM
> To: Jim Allen <Jim.Allen@interstatepm.com>
> Subject: Vehicles
>
> Hi Jim,
>     Thank you for the deposits. Is there anything that you had concerns on those vehicles? When did you guys want to pay the balance? Did you want to pay by Cashier's check or Wire transfer?
>
> Thank you,
>
> Kathy
>
> **Kathleen J Mead**
> Vehicle Sales Manager
>
> ASK ME ABOUT OUR FINANCE OPTIONS, WARRANTIES, PREVENTATIVE MAINTENACE PROGRAMS AND INSURANCE BY REIN
>
> **Ryder Vehicle Sales, LLC**
> 359 Hoover St NE
> Minneapolis, MN 55413
>
> T: 651-633-1373 Ext 11

20. On Monday, May 9th, 2022, Mr. Allen, consistent with Interstate's established and documented procedures, forwarded that email to Jill Barger of Interstate. Ms. Barger is the Controller for Interstate and the employee responsible for paying outstanding invoices for Interstate.

21. Later that same day, as is her normal procedure, Ms. Barger emailed Kathy requesting wire transfer information for Ryder, in order to process the payment. Ms. Barger contacts Kathy and requests, via email, the wire information every time they transact with Ryder.

5

22. Kathy responded that same day and provided Ms. Barger with the wire information and copy of the Bill of Sales, via multiple attachments. On behalf of Ryder, Kathy submitted the ACH/EFT/Wire Instruction Form with its Federal Tax ID number, the VINs for the vehicles, the amount of the write, and their bank information for the transfer.

23. The initial request for payment from Kathy to Jim Allen had been verified and confirmed by Ms. Barger through separate communication and the providing of the ACH/EFT/Wire Instruction Form.

24. Interstate and Ryder agreed to send and receive the payments in two equal wire transfers, each in the amount of $178,936.93.

25. On Wednesday, May 11, 2022, at 3:45 p.m., Kathy emailed Mr. Allen and Ms. Barger regarding the wire transfer. She wrote, "Please let me know once you have sent the wire so I can be looking for it. I am currently out of the office until Monday, but have access to me (sp) computer."

26. Ms. Barger replied 32 minutes later, "Will do, I plan to initiate this wire tomorrow a.m. and will send you confirmation. Thank you,"

27. Prior to any other action happening, a Fraudster intercepted these communications and entered the conversation under the guise of Kathy's email.

28. On Thursday, May 12, 2022, at 11:08 a.m., Ms. Barger received an email from a Fraudster, impersonating Kathy from Ryder, and using her exact same Ryder email address and nearly identical signature block. The signature block is nearly

identical, including using the Ryder logo and other information about financing. The only difference appears to be a change in the contact telephone number.

> From: Kathleen J Mead <Kathleen_J_Mead@ryder.com>
> Sent: Thursday, May 12, 2022 11:08 AM
> To: Jill Barger <jill@interstatepm.com>
> Subject: Payment
>
> Hi Jill
>
> We would like to receive our next payment into our updated bank account.
>
> Let me know if I can send the new bank details right now?
>
> Please do not make payment to the previous bank again.
>
> Kathleen J Mead
> Vehicle Sales Manager
>
> ASK ME ABOUT OUR FINANCE OPTIONS, WARRANTIES, PREVENTATIVE MAINTENACE PROGRAMS AND INSURANCE BY REIN
>
> Ryder Vehicle Sales, LLC
> 359 Hoover St NE

29. The Fraudster hacked into Interstate's email system and saw the correspondence and imminent wire transfers between the two businesses and took advantage. The Fraudster copied the email block and mimicked the email address, frequently known and used by both parties, to give the appearance of status quo and just a regular switch of banks.

30. The Fraudster, in that 11:08 a.m. email wrote, "we would like to receive our next payment into our updated bank account…. Please do not make payment to the previous bank again."

31. Ms. Barger responded 16 minutes later, "Yes, please send me the new stuff and I will use that."

32. Twenty minutes after Ms. Barger's email, the Fraudster responded, again from Kathy's Ryder email address, with the updated and now fraudulent bank account.

7

The Fraudster updated the Ryder ACH/EFT/Wire Instruction Form and only changed the banking information.

33. The Fraudster entered the Interstate email system and changed the wire transfer information within the system and then sent that updated, but wrong, information to Ms. Barger.

34. At 12:48pm on Thursday, May 12, 2022, Ms. Barger continued the wire transfer process by contacting Interstate's bank, Lake Area Bank (the "Bank") to further along the first wire transfer.

35. Consistent with the parties agreed upon and documented verification process, the Bank confirmed receipt of the request and verified the transfer through another employee at Interstate. The Bank then completed the wire transfer and sent $178,936.93 to the Fraudster's bank account.

36. Shortly after the transfer, Ms. Barger emailed Kathy to let her know that it was processed. Kathy responded at 1:15 p.m. "Thank you! I will be looking for it and let you know."

37. On May 18, 2022, the Fraudster impersonated Ms. Barger through her email and informed the Bank to send the remaining balance to the same fraudulent bank account. The Bank sent the money.

38. Shortly after the second amount was sent, Interstate caught on that there was fraud and notified the Bank, local law enforcement, and the FBI.

39. On June 1, 2022, Interstate properly reported this loss to National and subsequently submitted the requested claim forms to National for both losses, each for $178,936.93.

40. To date, no money has been recovered from the Fraudster.

41. On July 21, 2022, National advised that there was only partial coverage available for these losses. Specifically, National agrees that the second incident where the Fraudster impersonated and used Ms. Barger's email to instruct the Bank to initiate the second transfer ("Second Incident") was covered under the Policy. But, National asserts that there was no coverage for the first incident where the Fraudster changed the wire transfer information for the recipient, Ryder ("First Incident").

42. National has offered to provide full coverage for the Second Incident under the **Computer and Funds Transfer Fraud** policy.

43. In its denial letter, National asserts that the First Incident falls under the Social Engineering Endorsement, but denies coverage because Interstate did not follow an established and documented verification procedure as is required under the Policy, prior to any coverage.

44. Interstate believes coverage is available under both the **Computer and Funds Transfer Fraud** and the **Social Engineering Endorsement** sections of the Policy.

## COUNT ONE
## DECLARATORY JUDGMENT

Interstate restates the above allegations as if fully set forth herein.

45. By denying coverage for the First Incident under the Policy, National has breached its contract with Interstate. National has denied coverage despite the fact that its Policy provides for coverage and for which no exclusion applies.

46. Interstate requests this Court to declare the rights of the parties under the Policy to determine the coverage which exists for the Interstate loss under the First Incident.

47. This conflict constitutes an actual controversy subject to a binding adjudication by this Court and is subject to Declaratory Judgment pursuant to Minnesota Rules of Civil Procedure 57 and Chapter 555 of Minnesota Statutes.

COUNT TWO
BREACH OF CONTRACT

Interstate restates the above allegations as if fully set forth herein.

48. A valid and enforceable policy of insurance was entered into by the parties.

49. Interstate has fully performed its obligations under the Policy, including timely payment of all premiums due and timely reporting of all occurrences of loss under said Policy.

50. Each occurrence took place during the effective term of the Policy, was reported during the Policy, and was a covered loss for which no exclusion applies.

51. There has been no breach of the Policy by Interstate.

52. No reasonable interpretation of the Policy permits National's denial of coverage for Interstate's claim under the **Computer and Funds Transfer Fraud** and/or **Social Engineering Endorsement**.

53. By denying full coverage and failing to refuse to pay the full limit available for the Interstate loss, National has breached its obligations to Interstate and is responsible for full payment of the loss, and other costs and attorneys' fee pursuant to Minnesota law.

**WHEREFORE**, Interstate prays this Court the following relief:

A. Determining and adjudicating the rights and liabilities of the parties under the Policy;

B. Declaring that the Interstate claim is covered under the **Computer and Funds Transfer Fraud** and **Social Engineering Endorsement** parts of the Policy;

C. An award of a judgment against National for payment of Interstate's loss in the amount of $177,936.93, as well as all other court costs and attorneys' fees incurred by Interstate because of National's breach of its contract, prejudgment interest, post-judgment interest and such other relief as the Court may deem just and proper; and

D. Such other and further relief as the Court deems equitable and just.

## JURY DEMAND

Plaintiff files this jury demand and in doing so, respectfully demands a trial by jury on all issues.

Respectfully submitted,

Date: February 3, 2023           MILLER & STEVENS, P.A.

By: s/ John T. Barragry
John T. Barragry, Esq. (#0395208)
92 Lake Street S.
Forest Lake, MN 55025
Telephone: (651) 462-0206
john@millerstevens.com

*Attorney for Plaintiff*

11